[No. 6189.   Decided January 3, 1907.]

# J. B. Switzler, *Respondent,* v. Northern Pacific Railway Company, *Appellant.*[1]

Carriers—Of Goods—Stoppage In Transitu—Claim by Third Person—Title of Consignor. A railroad company transporting a shipment of horses received from the consignor, under a contract to transport from Washington to St. Paul, Minnesota, is not liable to a third person, from whom the consignor had purchased the horses, for failure to stop the shipment *in transitu,* upon being notified by such third person that the sale of the horses to the consignor was fraudulent and the sale rescinded, where notice was given by the carrier affording ample opportunity to such third person to institute legal proceedings to recover possession of the horses while en route.

Appeal from a judgment of the superior court for Walla Walla county, Brents, J., entered October 31, 1905, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action to recover the value of livestock shipped on defendant's railroad. Reversed.

*B. S. Grosscup,* for appellant, contended, *inter alia,* that the sale was not made on credit and the law pertaining to stoppage *in transitu* has no application. *Rowley v. Bigelow,* 12 Pick. 306; Benjamin, Sales, § 828; Rolle, Abridgment, 606; Story, Bailments (8th ed.), §§ 266, 450, 582; *The Idaho,* 93 U. S. 575, 23 L. Ed. 978. The carrier is not bound to assume the burden of proving that a third person is the legal owner of goods shipped. *Kohn v. Richmond etc. R. Co.,* 37 S. C. 1, 16 S. E. 376, 34 Am. St. 726, 24 L. R. A. 100. It was incumbent on the plaintiff to exhibit or account for the bill of lading. *First Nat. Bank v. Northern Pac. R. Co.,* 28 Wash. 439, 68 Pac. 965; *Ratzer v. Burlington etc. R. Co.,* 64 Minn. 245, 66 N. W. 988, 58 Am. St. 530.

*Sharpstein & Sharpstein,* for respondent, cited, among other cases: *Shellenburg v. Fremont etc. R. Co.,* 45 Neb. 487, 63

[1]Reported in 88 Pac. 137.

N. W. 859, 50 Am. St. 561; Hutchinson, Carriers, § 407; *Wells v. American Express Co.*, 55 Wis. 23, 42 Am. Rep. 695; *Western Transp. Co. v. Barber*, 56 N. Y. 544; *Williams v. Wall*, 60 Mo. 318; *Koch v. Branch*, 44 Mo. 542, 100 Am. Dec. 324; *Dusky v. Rudder*, 80 Mo. 400; *Mohr v. Langan*, 162 Mo. 474, 63 S. W. 409, 85 Am. St. 503.

Root, J.—This was an action by respondent to recover for the value of certain horses, shipped upon appellant's railway by one Colcord, to whom respondent had delivered said horses on a contract of sale and purchase. From the judgment in respondent's favor, this appeal is prosecuted.

Said Colcord, representing the Western Livestock Company, purchased from respondent and others twelve car loads of horses, which were commingled and shipped at one time from Kennewick, Washington. After the horses were aboard the cars, Colcord, in payment therefor, executed and delivered to W. H. Switzler, for the benefit of all of said shippers, a check, in the following words and figures, to wit:

"La Crosse, Wis., Aug. 15, 1903. No. . . .

"The State Bank of La Crosse. Pay to W. H. Switzler or bearer $2,826, Two Thousand Eight Hundred and Twenty-six Dollars.

"W. L. S. Co.      C. F. Colcord."

This check was turned over to one Harry Patterson, one of the shippers, who accompanied the horses upon the train, apparently in the service of Colcord or the Western Livestock Company. After the shipment had been started east, the following telegram was sent by the firm of which respondent was a member, or by its attorney:

"Walla Walla, Wash., Aug. 20, '03.

"Northern Pacific Railway Co., St. Paul:

"12 cars horses on line Montana shipped Kennewick August 15 consigned Western Live Stock Co. by C. F. Colcord sold by Switzler Bros. were purchased fraudulently. Vendors rescind sale. Stop at feeding place.

"Switzler Bros.      4:30 p. m."

To this telegram, appellant, on the same day, returned the following answer:

"St. Paul, Minn., Aug. 20th, 1903.
"Switzler Bros., Walla Walla, Washn.:

"Your wire concerning live stock. We have no right to stop this shipment on your demand. You do not appear as either shipper or consignee and we cannot recognize your right to control shipment. You can arrange to attach or replevin stock at Fargo when they arrive sometime Friday or at St. Paul on arrival there. You can talk with S. B. Calderhead at Walla Walla, who understands conditions. You can wire sheriff at Fargo or St. Paul to place matter in hands of reliable and capable lawyer.

"6:35 p. m.              Northern Pacific Railway Co."

At the time these messages were exchanged, the horses were aboard appellant's cars in transit between Glendive, Montana, and Dixon, North Dakota. On August 22, the following telegram was sent by one Baird, appellant's general freight agent, to wit:

"St. Paul, Minn., August 22, 1903.
"Switzler Bros., care S. B. Calderhead, Walla Walla, Wash.:

"Have received telegram from Calderhead regarding horse shipment from Kennewick by Western Live Stock Co. While still denying any responsibility in matter will endeavor to help you as far as possible. The horses fed at Fargo yesterday afternoon. Have wired Patterson and you can locate him by wire in care of agent Fargo. Recommend legal steps be taken by you bearing directly on this party, and property affected.                                J. B. Baird.'

This telegram was followed on the same day by another from said freight agent, as follows:

"St. Paul, Minn., Aug. 22nd, 1903.
"To Switzler Bros., care S. B. Calderhead, Walla Walla, Wash.:

"Regarding Kennewick shipment live stock for Western Live Stock Co.: Shipment should reach Twin City yards, near Minneapolis, tonight. Suggest you wire attorneys here to protect your interest. Howe & Taylor, St. Paul, recommended.                                    J. B. Baird."

When the horses reached St. Paul they were there held forty-eight hours. The expense of holding the same in the yards amounted to $90 per day. The consignor, Colcord, was at St. Paul, demanding the transfer and forwarding of the stock to its destination. Appellant alleges that there was due to it at St. Paul for freight $2,502.72, and for feed charged $122.50, a total of $2,625.22, and adding to this the expense of two days' feeding at St. Paul at $90 per day, the sum total becomes $2,805.22. The evidence fixed the value of the horses at from $2,824 to $3,360. It does not appear that respondent, or the firm of Switzler Brothers, with which he was connected, took any proceedings in court or made any effort by means of legal proceedings to obtain possession of said horses or prevent their delivery to the consignee. Appellant having, in accordance with its contract of shipment, delivered the horses to the consignee, respondent instituted this action and obtained a judgment as aforesaid.

It is appellant's contention that, having received the shipment from Colcord and entered into a contract to transport and deliver the same to the consignee indicated, it would not be justified in refusing to comply with the shipping agreement at the instance and demand of a stranger to the contract, and that the nature of its duties as a public carrier forbade that it should be authorized or required to act as arbiter between the shipper or consignee on the one hand and such stranger asserting title or right to possession of the property on the other; but that said third party should have been relegated to the courts where appropriate relief could have been accorded. Respondent urges that the appellant, as bailee, could assert no right to, or lien or claim upon, said property as against the rightful owner who had been wrongfully defrauded of the possession of said horses by the consignor; that its right to the possession of said horses could not be of any higher order than that of the consignor.

In their briefs, as well as in their oral arguments, counsel for the respective parties inform us that they have been unable to find that the exact question here involved has ever been adjudicated, excepting in the two cases of *Kohn v. Richmond etc. R. Co.*, 37 S. C. 1, 16 S. E. 376, 34 Am. St. 726, 24 L. R. A. 100, and *Shellenberg v. Fremont etc. R. Co.*, 45 Neb. 487, 63 N. W. 859, 50 Am. St. 561. The former of these cases upholds appellant's contention. The latter is authority for respondent's position. In its decision, the South Carolina supreme court, among other things, said:

"It seems to us that the whole case turns upon the question whether a carrier, resting under very stringent obligations to his bailor, is bound to assume the burden, where a third person makes a demand upon him for goods entrusted to him for transportation, not enforced by legal process, of showing, not only that such third person is a rightful owner, but is also entitled to the immediate possession of the goods. It seems to us that common justice would require that such burden should be assumed by the claimant, who is most likely to have the means of meeting it, and not upon the carrier, who cannot be supposed to know anything about the real ownership of the goods and has a right to assume that the person from whom he received possession of the goods was such rightful owner, possession of personal property being evidence of title."

Viewing the question from a practical standpoint, having in mind the manner in which railroad business is transacted and the necessity for method and system which must obtain, we are deeply impressed with the reasoning of said court. We are unable to perceive any principle of law applicable to common carriers that would justify a recovery upon the facts of this case. Such a carrier, as a public service corporation, must receive, transport, and deliver freight with safety, promptness and dispatch. When a person in the possession of personal property presents the same to such transportation company for shipment, upon the terms common to

the public, such carrier, in the absence of actual knowledge, or of the facts that should readily lead to actual knowledge, to the contrary, may assume that the would-be shipper is rightfully in possession of said property and authorized to enter into a legal contract for its transportation. Not only may such carrier presume this to be the case, but it is legally bound so to do and to receive such property for shipment. Having so accepted and forwarded said property, it becomes its duty to fulfill the contract of shipment made with the consignor. To deliberately violate that obligation at the request or demand of a third party, would be to incur the risk of damages for its breach—a hazard which the law does not require the carrier to assume. If, under such circumstances as are here presented, the transportation company was compelled to withhold the delivery of property until the rights of conflicting claimants could be adjudicated by it, a serious and unnecessary embarrassment to the business would be entailed, without adequate corresponding advantages.

Suppose, in the case at bar, the railway company had withheld the horses and undertaken a hearing upon the issue of fraud suggested, and upon the question of who was entitled to the delivery, would its decision have been binding upon the shipper or consignee? Assuredly not. He could have gone into court, if the horses were not delivered to him, and in such an action the "adjudication" by the company would constitute no defense or protection. The nature of the duties of a common carrier are inconsistent with the idea that it must, at its peril, assume the role of arbiter of title as between consignors or consignees, and third parties who may interpose demands for property *in transitu*. If respondent's contention were the law, no one would be able to compel a railway company to accept freight until he had made conclusive proof of ownership or right of possession. If actual possession and apparent ownership of an intending shipper, in the absence of actual knowledge by the carrier of such con-

signor's want of right in the property, is sufficient to compel the company to accept personal property for transportation, it would seem that every consideration of fairness and public policy would allow such possession and apparent ownership to justify the carrier in completing the contract of trans- portation and delivery. The duties and obligations of a com- mon carrier to the public constitute an element and consid- eration not involved when the bailee is not a public service corporation. Where the bailee is a private person or corpor- ation, upon whom no public or quasi public service or obliga- tion is imposed, any controversy regarding the ownership, management, or possession of a given bailment is ordinarily a matter in which the public has no interest. But the man- ner in which a railway company transacts its transportation business is a matter of concern to the public, and its dealing with any given shipment is controlled not merely by con- siderations affecting itself and the particular persons owning, or claiming an interest in, said property, but regard must also be had to such methods and system as the requirements of the public impose. It being concededly the duty of the common carrier to receive and safely and promptly transport property tendered for shipment, it would seem evident that such duty could be obviated, by a stranger to the shipment contract, only, if at all, under extraordinary conditions and for very urgent reasons.

This obligation is somewhat akin to that imposed upon certain public officers. For instance, the county auditor is required to file and record any deed of conveyance executed in due form when the proper fee is paid. Suppose a deed in regular form were by some person presented for record, and the fee paid, but before the actual filing, indexing, or recording, another person should appear and inform the county auditor that the deed had been obtained fraudulently and demand that it be not filed, indexed, or recorded—would the auditor be justified in complying with said demand? Sup-

pose the auditor did not comply with said demand, but filed, indexed, and recorded said deed in the usual manner, and it was subsequently established that said deed *was* obtained fraudulently, would the auditor be liable for damages occasioned by the filing, indexing, and recording of said deed after being told of the facts and requested not to so do? We think not. The auditor would not be the tribunal charged with the duty of determining such questions concerning deeds tendered in the usual manner for record. He could properly assert that the law neither invested him with that power nor burdened him with that obligation. So with a carrier. The franchise which it has from the government accords it those powers, and imposes those obligations, that are necessary to, and compatible with, the paramount purpose of its existence—the transportation of persons and property with safety and dispatch. But the determination of property rights and controversies, at the instance of persons not parties to its contracts and dealings, is a function which is not intrusted to, nor imposed upon, such corporations, but is reserved to the courts.

In this case the respondent had ample time to apply to the courts for appropriate relief. Had the company, when the demand was first made, voluntarily delivered the property to the consignor or consignee, without respondent being given any opportunity to begin legal proceedings, it is possible a different view might be entertained, although as to this we expressly decline to venture an opinion; but in the light of the suggestions made in the telegrams by appellant to respondent relative to taking legal proceedings, and the ample time afforded for so doing, we can find no ground upon which to base liability.

The judgment of the honorable superior court is reversed, and the case remanded with instructions to dismiss the action.

HADLEY, CROW, and RUDKIN, JJ., concur.

FULLERTON, J., concurs in the result.

MOUNT, C. J. and DUNBAR, J., took no part.